UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSE ARTURO GONZALEZ,

Petitioner,

v.

MARKWAYNE MULLIN, et al.,

Respondents.

Case No. 5:26-cv-02675-KES

ORDER GRANTING PETITION IN PART AND ORDERING PETITIONER'S RELEASE FROM CUSTODY

## I.    INTRODUCTION

For the reasons explained below, the Court (1) GRANTS Ground One of the Petition; (2) orders that Jose Arturo Gonzalez ("Petitioner") be IMMEDIATELY RELEASED FROM IMMIGRATION CUSTODY; and (3) DENIES the other claims in the Petition without prejudice as moot.

## II.    PROCEDURAL HISTORY

### A.    The Petition.

On May 19, 2026, Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 ("Petition" at Dkt. 1), challenging his detention by the Department of Homeland Security ("DHS"), Immigration and Customs

1

Enforcement ("ICE").  The Petition raised the following claims:

Ground 1: As a member of the class certified in American Baptist Churches v. Thornburgh, 760 F. Supp. 796 (N.D. Cal. 1991) ("ABC"), Plaintiff is being unlawfully detained and denied the benefits of class membership.  (Pet. ¶¶ 55, 90.)

Ground 2: Petitioner's detention is unauthorized under Matter of Patel, 15 I. & N. Dec. 666, 666–67 (BIA 1976) which held that where the non-citizen respondent was living with his wife and United States citizen child, had worked for the same employer for almost two years, had kept immigration authorities informed of his address, had never been arrested or convicted of any crime, and had never been involved with narcotics, there was no reason to justify holding respondent under even a minimal bond, and respondent was ordered released from custody on his own recognizance.  (Pet. ¶¶ 101-04.)

Ground 3: The Immigration Judge ("IJ") abused his discretion by denying Petitioner bond without considering the Guerra factors.[1]  (Pet. ¶¶ 111-18.)

Ground 4: The IJ abused his discretion by denying Petitioner bond by relying on agents' contested account of his arrest to satisfy the "clear and convincing evidence" standard.  (Pet. ¶¶ 121-125.)

Ground 5: The IJ abused his discretion by failing to set a reasonable bond amount.  (Pet. ¶¶ 129-30.)

Ground 6: Plaintiff has been deprived of a liberty interest (i.e., freedom from immigration detention) without due process, because the IJ's abuse of discretion violated due process.  (Pet. ¶¶ 132-36.)

Ground 7: Plaintiff's nine-month detention constitutes unconstitutionally prolonged detention.  (Pet. ¶¶ 138-43.)

**B.     The Verification.**

Petitions "for a writ of habeas corpus shall be in writing signed and verified

---

[1] Matter of Guerra, 24 I. & N. Dec. 37, 40 (BIA 2006).

by the person for whose relief it is intended or by someone acting in his behalf." 28 U.S.C. § 2242. An attorney may sign and verify the petition for the petitioner. Lucky v. Calderon, 86 F.3d 923, 925 (9th Cir. 1996). Initially, the Petition was signed by counsel but not verified. (Dkt. 1 at 25.) It was supported by a sworn declaration by habeas counsel authenticating exhibits A-V (Dkt. 1-1 at 2-4) and a declaration by immigration counsel, Mario Acosta, Jr. (Ex. J, Dkt. 1-2 at 50-51).

Petitioner subsequently provided a declaration verifying the Petition. (Dkt. 16-1 at 5.) Petitioner also signed one of the exhibits, a Form I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal pursuant to the Nicaraguan Adjustment and Central American Relief Act ("NACARA") under penalty of perjury. (Dkt. 1-2 at 53-64.)

### C.     The Answer.

Respondents answered the Petition on May 26, 2026. ("Answer" at Dkt. 9.) Respondents did not attach any supporting evidence or declarations but instead rely on the declarations and evidence attached to the Petition. The Answer urges the Court to deny the Petition for four reasons: (1) Petitioner received constitutionally adequate bond hearings (id. at 3-4); (2) the Court lacks jurisdiction to review an IJ's flight-risk findings, even under an abuse of discretion standard (id. at 4-7); (3) the Court should not waive prudential exhaustion and consider the legality of Petitioner's detention until he exhausts a lengthy appeal to the Board of Immigration Appeals ("BIA") (id. at 8-9); and (4) Petitioner's detention is authorized because he is in ongoing removal proceedings (id. at 9). The Answer does not address Ground One claiming the benefits of ABC class membership. (Id.)

### D.     The Reply and First Supplemental Briefs.

On May 27, 2026, Petitioner replied. ("Reply" at Dkt. 10.) On June 3, 2026, at the Court's request, Respondents filed a copy of the administrative arrest warrant Form I-200. (Dkt. 12.) Petitioner filed a response, arguing that the arrest

warrant (Dkt. 12-1) is inconsistent with the agents' account in the Form I-213 (Dkt. 1-3 at 14). (Dkt. 13.) Petitioner also filed a notice of supplemental authority. (Dkt. 14.)

### E. Second Supplemental Briefs.

The Court directed Petitioner to file a supplemental brief with evidence to address a list of issues. (Dkt. 15.) In response, Petitioner filed a supplemental brief with additional exhibits. (Dkt. 16.)

The Court invited Respondents to respond to Petitioner's supplemental brief and new evidence by June 19, 2026. (Dkt. 17.) They did not file anything.

## III. FACTUAL RECORD

### A. Petitioner's Entry Into the United States.

Petitioner is a citizen of Guatemala. (Pet. ¶ 13.) He arrived in the United States in 1990 without inspection and has resided in the United States since that time. (Pet. ¶ 19.) As discussed further below in Section IV.A.2., Petitioner's exact date of entry into the United States is material to Ground One, and the record contains conflicting evidence about this fact.

### B. Asylum Application and Initiation of Removal Proceedings.

Petitioner applied for asylum on December 23, 1991. (Pet. ¶ 22; Dkt. 1-1 at 70.) At some point after applying for asylum, he had an interview with the asylum office regarding ABC class membership. (Pet. ¶ 60.) In December 2006, Petitioner received a notice dated December 4, 2006, stating that he was "ineligible for ABC benefits" for two reasons: (1) he had not established that he was a member of the ABC class; and (2) there was "no credible evidence" that he had registered for ABC benefits. (Pet. ¶ 60; Dkt. 1-1 at 75.) The notice does not give a further explanation or provide any other facts specific to Petitioner's situation.

About two weeks later, on December 18, 2006, Petitioner was placed into removal proceedings. (Pet. ¶ 23.) The NTA indicates that he was subject to

4

removal under the Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i). (Dkt. 1-3 at 23.)  He was ordered to appear before an IJ in Los Angeles on January 31, 2007.  (Id.)

His removal proceedings "were administratively closed on March 1, 2013" due to prosecutorial discretion  (Pet. ¶ 23; Dkt. 1-2 at 40.)  At some point, he received work authorization and was "complying with everything he needed to do."  (Dkt. 1-2 at 40; Dkt. 1-3 at 10 (work authorization card); Dkt. 1-3 at 1 (social security earnings statement).)

On July 1, 2025, an IJ "recalendared the removal proceeding," restoring Petitioner's case to the active docket.  (Pet. ¶ 24.)  A master hearing was scheduled for November 2025.  (Dkt. 1-3 at 15.)  His removal proceedings remain ongoing. (Dkt. 9 at 2.)  He has an individual hearing scheduled for June 29, 2026.  See Executive Office for Immigration Review ("EOIR"), Automated Case Information, https://acis.eoir.justice.gov/en/ (A# 071-585-073, Guatemala, last accessed June 26, 2026).

### C.    Petitioner's Arrest.

Before the November 2025 master hearing took place, on August 6, 2025, Petitioner was arrested by ICE agents on the sidewalk in front of his apartment complex in Norwalk, California.  (Pet. ¶ 25.)  The Form I-200 arrest warrant says that Officer Cordova had probable cause to believe Petitioner was removable because he was the subject of ongoing removal proceedings, as confirmed by records or "other reliable evidence."  (Dkt. 12-1.)  Petitioner has been in immigration custody ever since.  (Pet. ¶ 25); see also ICE Detainee Locator, https://locator.ice.gov/odls/ (A# 071-585-073, Guatemala, last accessed June 26, 2026).

There are two very different accounts of what took place during Petitioner's arrest: the August 7, 2025 Form I-213 signed by Officer Carmona and the May 2026 declaration by Petitioner's adult son, Steven.

### 1.    The Form I-213.

On August 6, 2025, Agent Duenas and others were "conducting surveillance and intelligence gathering" in Norwalk. (Dkt. 1-3 at 13.)  From immigration records, they would have known Petitioner's home address on Excelsior Drive (see Dkt. 1-1 at 75) and the fact that his removal proceedings had been recently reopened.  At 7:30 a.m., Agent Duenas identified Petitioner outside near Petitioner's home address. (Dkt. 1-3 at 14.)  He knew that Petitioner was a "removable alien from Guatemala." (Id.)  He did "record checks" that purportedly revealed that Petitioner "was in possession of an expired Employment Authorization card." (Id.)  Upon seeing that, Agent Duenas "then requested and received" an I-200 administrative warrant for Petitioner's arrest. (Id.)

At 8:15 a.m., Agents Duenas and Menjivar approached Petitioner on the sidewalk.  They were in plain clothes but wearing badges on lanyards.  They "identified themselves as Border Patrol Agents and told Petitioner that they had a warrant for his arrest."  In response, Petitioner screamed, "Steven!" the name of one of his adult sons.  Upon hearing this, "two of his adult sons and his wife appeared from an apartment complex and approached the agents."  The "family screamed at" the agents and "questioned the rights of the agents' actions."  Agent Duenas told them that Petitioner was under arrest and "showed the warrant to his wife." (Id.)

Petitioner "refused to be arrested and struggled with the agents." Eventually, the agents handcuffed him and placed him in a service vehicle.  The "family stood in front of and placed a garbage can in the path" of the agents' vehicle.  "They also briefly blocked the Service vehicle from leaving with a white Kia Forte."  Before driving away, the agents allowed Petitioner "to give his wallet to one of his sons." (Id.)

### 2.    Steven's Declaration.

In May 2026, Steven signed a declaration giving his account of his father's

arrest. (Dkt. 1-2 at 46.) According to Steven, he was in his room studying the morning of August 6, 2025, when he "heard some noise and [his] dad say that he wanted to show his work permit and that he had legal status." (Id. ¶ 5.) After hearing this noise, he came out of the house and saw his "dad on the ground with at least two people on top of him and other people around him." (Id. ¶ 6.) At first, he thought that his "dad was getting attacked," but as he drew closer, he "saw someone with a police vest." (Id. ¶ 6.) The agents did not say "they were from immigration." (Id. ¶ 7.)

Steven saw "three vehicles …blocking the street" and asked what was happening. (Id. ¶ 7.) He heard Petitioner "pleading that he had his work permit on him and trying to show them." (Id. ¶ 8.) When Steven asked to see the agents' badges, someone told him that they had a warrant. (Id. ¶ 9.) A male agent showed him a document on a phone screen and said it was a warrant, but Steven could not verify that it was a warrant because the screen view "was zoomed in." (Id. ¶ 9.)

Contrary to the agents' account, Petitioner's wife, while at home, never came out of the house during the arrest. She never interacted with the agents at all – let alone screamed at them, blocked them, or viewed a warrant. (Id. ¶ 10.) While Steven has two siblings, they were not present during the arrest. He "was the only family member … present at [Petitioner's] arrest." (Id. ¶¶ 3, 10.)

As for the garbage cans, Steven notes that August 6 was trash day, so residents of the apartment complex had placed their garbage cans on the street for trash pickup. (Id. ¶ 12.) He did not see anyone move a garbage can to try to block the agents' vehicle. (Id.)

As for the white KIA, his neighbor owns that car. (Id. ¶ 13.) Steven observed that the agents parked one vehicle blocking that neighbor's driveway. (Id.) When the agents were trying to leave, the neighbor returned home. (Id.) Steven did not see anything that made it obvious to him that the KIA's driver was intentionally trying to block the agents' vehicle as opposed to trying to pull into his

own driveway.  (Id.)  In any event, the KIA's driver was a neighbor, not a family member.  (Id.)

Steven saw the agents handcuff his father and place him in a vehicle.  Steven asked the agents if his "dad could give me his keys and wallet."  (Id. ¶ 14.)  The officers let Petitioner give Steven his keys and wallet.  (Id.)

**D.    Petitioner's NACARA Application.**

In December 2025, Petitioner, with the help of a lawyer and an interpreter, filed a USCIS Form I-881, "Application for Suspension of Deportation or Special Rule Cancellation of Removal."  (Dkt. 1-2 at 53.)  He identifies himself as a Guatemalan national who entered the United States before October 1, 1990, and timely registered for benefits under the ABC settlement agreement.  (Id. at 54.)  The form also says, however, that he entered the United States on October 2, 1990.  (Id. at 55.)  As discussed further below in Section IV.A.2., attorney Acosta declares this was his error, and the correct date of entry is September 15, 1990.  (Dkt. 16-1 at 9.)

**E.    Bond Denial #1**

On September 3, 2025, an IJ, Ravit Halperin, denied Petitioner's request for release on bond due to lack of jurisdiction, finding that he was subject to mandatory detention.  (Dkt. 1-3 at 20-21.)

Petitioner, along with eight others, filed a counselled petition for writ of habeas corpus and an application for temporary restraining order ("TRO"), requesting a bond hearing, in Gonzalez Giron v Noem, 5:25-cv-03395-SSS-BFM (C.D. Cal.) ("Gonzalez I").  (Pet. ¶ 30.)  The district court noted, "The troubling circumstances surrounding the refusal by executive agencies to provide Petitioners, and those in the Bond Eligible Class [certified in Maldonado Bautista v. Santacruz, 813 F. Supp. 3d 1084 (C.D. Cal. 2025)], with bond hearings are all too familiar with this Court."  (Gonzalez I, Dkt 13 at 2.)  The district court found that Petitioner was being detained under § 1226(a) and thus entitled to a bond hearing at the

8

outset of detention.  (Id. at 7.)  On December 19, 2025, the district court issued a TRO that enjoined Respondents "from continuing to detain Petitioners unless they are provided with individualized bond hearings before an immigration judge pursuant to 8 U.S.C. § 1226(a) within 7 days of the date of this Order."  (Id. at 10.)

### F.    Bond Denial #2

Per the Gonzalez I order, on December 23, 2025, Petitioner received a bond hearing before IJ Curtis White.  (Pet. ¶ 31.)  The IJ placed the burden on Petitioner to prove he was neither a flight risk nor a danger to others.  (Pet. ¶ 32.)  The IJ denied bond, finding Petitioner to be a flight risk.  (Pet. ¶ 33.)  The one-sentence order simply says, "[T]he respondent failed to meet his burden to establish that he is not a flight risk."  (Dkt. 1-3 at 17.)  Based on the record before the district court, it is unclear on what evidence the IJ relied.  This bond denial is pending appeal to the BIA.  (Dkt. 16-1 at 9, ¶ 4.)

On December 29, 2025, the government filed a status report recounting the results of the December 23rd bond hearing.  (Gonzalez I, Dkt. 15.)  After the district court issued an order to show cause why the case should not be dismissed as moot, on January 6, 2026, the Gonzalez I petitioners dismissed the case.  (Id., Dkt. 16, 17.)

### G.    Bond Denial #3

By February 2026, Respondents determined that Petitioner qualified for a bond hearing under Rodriguez v. Holder, No. 07-cv-3239-TJH-RNB, 2013 U.S. Dist. LEXIS 135479, 2013 WL 5229795 (C.D. Cal. Aug. 6, 2013)[2] because he had been in ICE detention for more than six months.  (Pet. ¶ 34.)  That hearing was

---

[2] Affirmed in part and reversed in part, Rodriguez v. Robbins, 804 F.3d 1060 (9th Cir. 2015), reversed in part, Jennings v. Rodriguez, 583 U.S. 281 (2018).

conducted on February 2, 2026, again by IJ Curtis White.  (Dkt. 1-2 at 36-44 (unofficial hearing transcript).)

Per the transcript, Petitioner was represented by counsel and assisted by a Spanish interpreter.  (Id. at 36.)  DHS marked four exhibits for identification, including the Form I-213 describing Petitioner's arrest.  (Id.)  Petitioner's counsel objected that the Form I-213 "contains fraudulent statements from Agent Duenas," but the IJ accepted it into evidence, noting that he would "later determine what weight it merits."  (Dkt. 1-2 at 37.)

Counsel for the government argued that Petitioner was a flight risk because, per the Form I-213, he was "combative" while being "arrested lawfully with an arrest warrant" and "escalated the situation by calling out to his adult sons."  (Id. at 37.)  Counsel argued that Petitioner's two adult sons were shown a "lawful arrest warrant for their father," but nevertheless "aggravated the arrest experience." Counsel told the IJ that the "family stood around" and "placed garbage cans around the path of the serviced vehicles" and "blocked" the agents' vehicle from leaving. No agents testified at the bond hearing.  There was no discussion of potential footage from body-worn cameras.

The IJ asked Petitioner's counsel why the Form I-213, if truthful, did not prove that Petitioner was a flight risk.  (Id. at 39.)  Petitioner's counsel argued that Petitioner is eligible for NACARA relief, so he "definitely would have an incentive to appear to all of his immigration court hearings given that he has a potentially favorably application" for asylum pending.  (Id. at 41.)  Counsel explained that while in 2006, the government found Petitioner ineligible for NACARA "because he hadn't timely filed for ABC registration," there was "a subsequent 9th Circuit decision that said that simply filing the I-589 [asylum application] … is … enough," which Petitioner had timely done in 1991.  (Id. at 41.)  Counsel also emphasized that, contrary to the government's arguments, Petitioner did not need a financial sponsor because he had been supporting himself and filing "taxes for

10

years." (Id. at 41.)  He had a work authorization valid until 2030. (Id.)

Petitioner's counsel also disputed that the Form I-213 truthfully described the circumstances of Petitioner's arrest.  In the Form I-213, "Agent Duenas … states that the reason [Petitioner] was targeted for arrest was … an expired work authorization," and he only requested an arrest warrant after learning that. (Id. at 39.)  Counsel argued that this "undercuts" the credibility of the entire Form I-213 because the government's own evidence shows that Petitioner's work authorization was *not* expired in August 2025, a fact presently uncontested.[3] (Id. at 39-40.)  Counsel told the IJ that Petitioner's adult son, Steven, an eyewitness to the arrest, was attending the hearing remotely and prepared to testify about what really happened. (Id. at 40.)  The IJ responded that he "just [did not] have time" to hear Steven's testimony due to his heavy work load and a computer outage that morning. (Id. at 42.)  He directed counsel to summarize Steven's testimony in a proffer instead. (Id.)

Petitioner's counsel explained that Steven would testify that while Petitioner did call out Steven's name, prompting Steven to go outside, "at no time did he ever have any physical contact or did he ever verbally assault the ICE officer." (Id.)  Counsel further proffered that Steven would testify that the people who acted against the ICE officers where not Petitioner's family members, but rather neighbors from the apartment complex. (Id.)  Steven would testify that no family member owns a white KIA, the car described in the Form 1-213 as blocking the agents' car. (Id.)

---

[3] In the June 3, 2026 status report, Respondents contend that Petitioner's "arrest warrant was not based on the assertion that Petitioner's work authorization had expired." (Dkt. 12 at 2.)  Petitioner's response emphasizes how this apparently contradicts the Form I-213 which says that Agent Duenas only requested an arrest warrant after doing a records check that purportedly revealed Petitioner's work authorization had expired. (Dkt. 13 at 2, citing Dkt. 1-3 at 14.)

11

After hearing this short proffer, the IJ did not ask any questions.  The IJ took the matter under submission.  (Id.)  Later the same day, the IJ issued a one-sentence ruling: "DHS met its burden to establish by clear and convincing evidence that the applicant's release would pose such a significant flight risk that no amount of bond and/or alternatives to detention would be appropriate."  (Dkt. 1-2 at 33.)  On February 11, 2026, Petitioner appealed that decision to the BIA.  (Pet. ¶ 44.)

On February 12, 2026, the IJ issued a longer memorandum using a check-the-box form.  (Dkt. 1-2 at 13-27.)  First, the IJ found the fact that Petitioner had entered the country without authorization "particularly salient" to assessing the risk of flight.  (Id. at 23.)  The IJ did not explain why this was so salient, given that Petitioner had voluntarily identified himself to authorities in 1991 by applying for asylum and had thereafter lived in the United States for more than thirty years.

The IJ then fully credited the agents' account of Petitioner's arrest and rejected Steven's account.  The IJ supported his flight risk analysis by finding that Petitioner had a "dubious" support system in the United States.  (Id. at 23.)  The only supporting evidence was the agents' account of misconduct by Petitioner's purported family members.  The IJ wrote, "[A]ccording to the arresting DHS officers, the family interfered with DHS's enforcement actions."  (Id. at 24.)  Thus, the IJ accepted that the people screaming at the agents and blocking their path were Petitioner's "family," even though it is unclear how the agents, who had never previously met Petitioner or his family, could have distinguished Petitioner's family members from the neighbors.

The IJ also credited the agents' account that Petitioner "refused to be arrested and struggled with the agents" as evidence that he was trying to flee rather than evidence that he was trying to clear up a misunderstanding by showing them his unexpired work authorization.  While the check-the-box form had boxes to identify mitigating factors, like lengthy residency, letters of support, a stable

12

address, and lack of a criminal record (all of which are true of Petitioner), the IJ did not check any of those boxes.  The IJ recited that he had considered the "mitigating factors" without identifying those factors then judged that the mitigating factors were outweighed by the misconduct of "the family" and Petitioner during the arrest.  (Id. at 25.)  The IJ concluded that DHS had proven that Petitioner was a flight risk by clear and convincing evidence.[4]  (Id. at 21.)  The IJ "did not reach a determination on danger or national security risk because the flight risk is clear." (Id. at 22.)

This bond denial is also pending appeal to the BIA.  (Dkt. 16-1 at 9, ¶ 4.)

**H.      Bond Denial #4**

On February 14, 2026, Petitioner sought a fourth bond hearing based on the ABC settlement agreement.  (Pet ¶¶ 55-56.)  On March 4, 2026, IJ White denied bond without addressing whether Petitioner was an ABC class member.  (Dkt. 1-1 at 13.)  Instead, the IJ cited 8 C.F.R. § 1003.19(e) for the premise that since there was no material factual change since the last bond decision on February 2, 2026, Petitioner was not entitled to consideration of this new argument.  (Id. at 20.)  The IJ also wrote that the district court, rather than the immigration court, had exclusive jurisdiction to decide this issue, as follows:

> Since the last bond hearing, the applicant raised the issue of claimed "ABC" class membership and argues that he does not fall within the enumerated exceptions to the general preclusion on detention of class members.  See American Baptist Churches v. Thornburg, 760 F. Supp. 796 (N.D. Cal. 1991).  The Court considered the claims but ultimately is not persuaded that this is the proper forum for the

---

[4] The clear and convincing standard of proof requires evidence "so clear as to leave no substantial doubt; sufficiently strong to command the unhesitating assent of every reasonable mind."  Fenn v. Penske Logistics, Inc., No. CV F 10-1507 LJO SMS, 2011 U.S. Dist. LEXIS 107209, at *47 (E.D. Cal. Sep. 21, 2011).

claims.  ABC class membership and eligibility for attached benefits are determined by an asylum officer.  See generally id.  Here, DHS contested class membership.  Regardless, however, where a class member asserts that he is detained in violation of the ABC settlement agreement, there is a prescribed procedure for such a claim and the class member may otherwise seek "judicial relief through habeas corpus to challenge his or her detention[,]" neither of which involves the Immigration Court.  Id. at 810.  Indeed, a class member who has been denied ABC benefits may seek enforcement "by initiating a separate proceeding in any federal District Court[.]"  Id.

(Dkt. 1-1 at 21.)

## IV.    DISCUSSION

### A.    Ground 1: ABC Class Membership.

#### 1.    Requirements for ABC Class Membership.

In 2007, the Ninth Circuit summarized the terms of the ABC class settlement.  Chaly-Garcia 508 F.3d 1201, 1202 (9th Cir. 2007).  The settlement gives certain benefits to the class of "all Guatemalans in the United States as of October 1, 1990" who (1) have not been convicted of an aggravated felony and (2) indicated their intent to receive the benefits between July 1, 1991, and December 31, 1991.  Id.  In Chaly-Garcia, the government argued that plaintiff had not timely indicated his intent to receive class benefits, although he had applied for asylum, because "he neither asked for a de novo asylum adjudication nor explicitly referenced the ABC Agreement in his asylum application."  Id. at 1204.  The Ninth Circuit held that neither of these things were required to become an ABC class member.  Id.  Similarly, it did not matter that plaintiff had never submitted an official registration card.  Id.

If a noncitizen is an ABC class member, then immigration authorities may only detain them if they have been convicted of a qualifying crime, pose a national

14

security risk, or pose a threat to public safety.  Am. Baptist Churches v. Thornburgh, 760 F. Supp. 796, 804 (N.D. Cal. 1991).

### 2.  Evidence About Petitioner's Date of Entry.

Respondents did not address Ground 1 in the Answer.  (Dkt. 9.)  There appears to be no factual dispute that Petitioner is Guatemalan, has never been convicted of a crime, and applied for asylum on December 23, 1991, which, per Chaly-Garcia, now counts as timely registration for ABC class benefits.  (Pet. ¶ 22; Dkt. 1-1 at 70.)  The only other fact necessary to establish Petitioner's membership in the ABC class is whether he entered the United States on or before October 1, 1990.

#### a.  The Acosta Declarations.

In February 2026, Petitioner's immigration attorney, Mr. Acosta, filed a motion in immigration court seeking bond and custody redetermination due to Petitioner's membership in the ABC settlement class.  (Dkt. 1-1 at 40.)  Mr. Acosta represented that Petitioner qualifies as a class member, citing as evidence the NTA/Form I-862 with the handwritten note stating Petitioner entered the United States on September 15, 1990.  (Id. at 40, 68.)

In his second June 2026 declaration filed in this Court, Mr. Acosta explains that Petitioner's asylum application was corrected during his asylum interview to reflect September 15, 1990, as the date of entry, and that "this entry date was handwritten onto the Form I-862 Notice to Appear ("NTA") and accepted without objection by [DHS] as the true and correct date of entry of Mr. Gonzalez."  (Dkt. 16-1 at 9, ¶ 1.)

#### b.  The Form I-862 NTA.

The NTA was produced to Petitioner by the government with the handwritten "Sept. 15, 1990" notation.  (Dkt. 16 at 2; Dkt. 16-1 at 5, ¶ 3.) According to Mr. Acosta's declarations, the handwritten notation was made in response to Petitioner correcting his date of entry during his December 2006

asylum interview.

          c.     The Form I-589 Asylum Application.

Petitioner's 1991 Form I-589 asylum application, filed on December 23, 1991, says that he entered the United States on "October 2, 1990." (Dkt. 1-1 at 70.) This date of entry is repeated in the filing receipt for the asylum application. (Id. at 71.)

In supplemental briefing, Petitioner explains that this date was entered in error by his immigration attorney, Mr. Acosta. (Dkt. 16 at 2; Dkt. 16-1 at 5, ¶ 6; Dkt. 16-1 at 9, ¶ 2. ) At Petitioner's December 4, 2006 asylum interview, his asylum application was amended to reflect September 15, 1990, as the date of entry. (Id.; Dkt. 16-1 at 2, ¶ 10; Dkt. 16-1 at 29 (form showing correction).)

          d.     The Form I-881 NACARA Application.

In Petitioner's verified Form I-881 NACARA application dated December 15, 2025, he (or the lawyer or interpreter who assisted him) checked a box identifying himself as a "National of Guatemala who first entered the United states on or before October 1, 1990 …." (Dkt. 1-2 at 54, 64.) Later in the same form, however, Petitioner states that his date of first entry into the United States was "10/02/1990." (Id. at 55.) Again, Mr. Acosta declares that he is responsible for mistakenly writing October 2, 1990, as Petitioner's date of entry. (Dkt. 16-1 at 9, ¶ 1.)

          e.     The Form I-213 Record of Deportable/Inadmissible Alien.

The I-213 form dated August 7, 2025, describing Petitioner's arrest says that he entered the United States "on or about October 2, 1990." (Dkt. 1-3 at 15.) This form, completed by government agents who would not have personal knowledge of Petitioner's date of entry, apparently took the mistaken date from other documents in Petitioner's file.

f.      Petitioner's Declaration.

Petitioner declares unequivocally that he entered the United States "on September 15, 1990." (Dkt. 16-1 at 5, ¶ 3.)  He adds, "I know September is correct because I left Guatemala in August of 1990." (Id.)

### 3.      Analysis.

As discussed above, there is some evidence that Petitioner did not enter the United States on or before October 1, 1990, namely, (1) his 1991 asylum application which says he entered the United States on October 2, 1990 (Dkt. 1-1 at 70); and (2) his sworn 2025 NACARA application which also says he entered the United states on October 2, 1990 (Dkt. 1-2 at 55).  But Petitioner has adequately explained that these dates were mistakes made by his immigration attorney.  (Dkt. 16.)

In contrast, there is strong evidence that Petitioner *did* enter the United States in September 1990, namely, (1) his declaration based on his personal knowledge (Dkt. 16-1 at 5, ¶ 3); (2) corrections to his asylum application made years ago during his interview (Dkt. 16-1 at 29); and (3) the handwritten "Sept. 15, 1990" notation on the official NTA (Dkt. 1-3 at 23).

An answer to a habeas petition "must address the allegations in the petition." See Rule 5(b) of the Rules Governing Section 2254 Petitioner.[5]  Whether Petitioner entered the United States on or before October 1, 1990, is a fact material to Ground One, which seeks relief as an ABC class member.  Respondents have had multiple opportunities to present legal arguments or additional evidence to try to refute the facts and law establishing Petitioner's entitlement to relief on Ground One, but they have not done so.

---

[5] The Rules Governing Section 2254 Cases apply to § 2241 habeas petitions. See Rule 1(b) ("The district court may apply any or all of these rules to a habeas corpus petition not covered by" 28 U.S.C. § 2254.).

First, the Court finds that it has jurisdiction to address Ground One. Petitioner tried to raise this claim before an IJ, but the IJ, citing ABC, found that Petitioner needed to raise the claim by initiating a habeas proceeding in district court. (Dkt. 1-1 at 21.)

Second, based on the factual record before the Court, the Court finds that Petitioner has satisfied his burden to demonstrate entitlement to relief on Ground One. Specifically, he (1) entered the United States before October 1, 1990; (2) has not been convicted of a felony; and (3) timely registered for ABC class benefits by applying for asylum. Petitioner, therefore, is a member of the ABC class and entitled to the benefits of ABC class membership.

Once such benefit is that he may not be detained by immigration authorities unless he has been convicted of a qualifying crime, found to pose a national security risk, or found to pose a threat to public safety. ABC, 760 F. Supp. at 804. None of these are true of Petitioner, so his current detention – which has lasted from August 2025 to June 2026 – is illegal. On this basis, the Court grants relief on Ground One.

## V. CONCLUSION

IT IS THEREFORE ORDERED that:

1.  Ground One of the Petition is **granted**.

2.  All other grounds are denied without prejudice as moot.

3.  ***Respondents shall immediately release Petitioner Jose Arturo Gonzalez, a.k.a., Jose Arturo Gonzalez-Giron (A# 071-585-073) from custody***.

4.  If Respondents have not released Petitioner within three days of the date of this Order, Petitioner may file a request for an order to show cause re contempt.

5.  Respondents may not re-detain Petitioner without providing him with a pre-detention hearing before a neutral decisionmaker where

Respondents bear the burden of demonstrating by clear and convincing evidence that Petitioner can be detained despite his <u>ABC</u> class membership (i.e., he has been convicted of a qualifying crime, poses a national security risk, or poses a threat to public safety).[6]

DATED:  <u>June 26, 2026</u>          _____

KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

---

[6] To the extent Petitioner seeks attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), Petitioner's counsel would need to file a post-judgment motion that complies with 28 U.S.C. § 2412(d)(1)(B).